MARYANN SVETANOFF, Plaintiff-Appellant, *v.* KATHERINE KRAMER, Defendant-Appellee.

First District (3rd Division)   No. 78-1382

Opinion filed December 19, 1979.—Rehearing denied February 1, 1980.

John Bernard Cashion, of Chicago, for appellant.

Seymour Zaban, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

In a trial arising out of an automobile accident between three cars, the jury returned a general verdict for Katherine Kramer and a special verdict finding that she was without contributory negligence. Although the general verdict was in her favor, the jury refused to award her any damages on her counterclaim. The inconsistent verdicts are so indicative of a compromise on liability that a new trial must be held. In addition, to avoid any errors in instructions on remand, it is necessary to consider in this opinion the rights-of-way of the various vehicles involved in the collision.

I

The date of the accident was the afternoon of May 21, 1973; the place, at the intersection of 31st Street and Michigan Avenue in Chicago. At this intersection, 31st Street is two-way, with two lanes running in each

direction. Michigan Avenue narrows to the south of 31st Street. North of the intersection there are five lanes running south and two lanes running north; but south of the intersection Michigan Avenue becomes a one-way street, with all five lanes headed south. Traffic lights govern the flow of traffic at the intersection.

Michael Svetanoff was driving south on Michigan Avenue in a car owned by Maryann Pitula (later to become Mrs. Svetanoff). Maryann and two other women were passengers in the car. At the same time, Katherine Kramer and Iola Stecker, both nuns, were headed west on 31st Street. In the rush-hour traffic, the Kramer car had fallen behind an Impala. When the Impala entered the intersection, it stopped in order to make a left turn and head south on Michigan. The record is not clear whether the Impala signaled its intention to make a left turn.

Kramer, who had entered the 31st-Michigan intersection on the green light, came to a stop behind the Impala. Her car was in the innermost westbound lane of 31st Street, and it and the Impala in front blocked three of the five southbound lanes on Michigan. The Impala was able to make its left turn and clear the intersection only when the 31st Street light it was facing turned red; it did so and left the Kramer car alone in the middle of the intersection.

Traffic on Michigan remained partially blocked. Kramer faced a red light, and while the traffic on Michigan faced a green light, it also faced Kramer's car. Of the westernmost lanes of Michigan, only the curb lane was clear. In the next lane to the east three or four cars were lined up, unable to move forward because of Kramer's car. One auto in the curb lane got around Kramer by passing in front of her car. The driver of the next car, a Volkswagen, which Kramer testified was in the curb lane and Stecker testified was either in the curb lane or the lane next to it on the east, saw Kramer's predicament, stopped and waved her through the intersection in front of him. She accelerated to 5 to 10 miles per hour and started to move west through the intersection against the red light. Kramer then in her rear-view mirror saw the Volkswagen pass behind her.

At that moment, Michael Svetanoff entered the intersection, moving south in the curb lane of Michigan. He had slowed as he approached the intersection because he was facing a red light. Before he reached 31st Street, however, the light turned green and he accelerated again. The line of cars backed up to the north of Kramer was to his left. It obscured his view of the intersection. He first saw Kramer's car when it passed in front of him as he entered the intersection. Svetanoff was unable to stop, and he ran into the right rear of Kramer's car.

Meanwhile, Joseph Colella had been eastbound on 31st Street. When he approached the intersection, the Impala turning south blocked his way, so he stopped at the light to wait for the car in front of him to move

out of the way. As he waited, the light he was facing turned red, so Colella stayed where he was. His car was positioned behind the crosswalk lines. Kramer approached him in the lane to Colella's immediate left; when she was hit by Svetanoff, the force of the collision drove her car around and into Colella's car.

Undisputed evidence at trial showed that Kramer suffered damages of $1,069.37 for medical expenses and repairs to her automobile. Similar evidence showed that damages to Colella's car totaled $1,026.51. A stipulation set the damages to the Svetanoff car at $1,871. The jury was given a special interrogatory inquiring into Kramer's contributory negligence. The following verdicts were returned:

—Kramer prevailed over Maryann Svetanoff on Svetanoff's claim for damages to her car and for her personal injuries.

—Kramer prevailed over Joseph Colella on his claim for damages to his car.

—Kramer prevailed over Michael Svetanoff on her counterclaim for damages to her car and her medical expenses, but the jury awarded her damages of $0.

—Joseph Colella prevailed over Michael Svetanoff on Colella's claim for damages to his car and the jury awarded him damages of $1,026.51.

—Kramer was not negligent.

Maryann Svetanoff filed a post-trial motion for a new trial or for a judgment notwithstanding the verdict (j.n.o.v.). Kramer likewise moved for a j.n.o.v. The trial court denied Svetanoff's motion, but granted Kramer's, and entered judgment in favor of Kramer against Michael Svetanoff in the sum of $1,069.37, the undisputed amount of her damages. Judgment was entered on the verdict in the Colella-Kramer, the Colella-Michael Svetanoff and the Maryann Svetanoff-Kramer suits. Maryann Svetanoff alone has appealed from the judgment.

## II

■■ The verdicts of a jury which indicate that compromises were made on damages and liability cannot be allowed to stand. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275, 286.) While a verdict of $0 damages is proper if there is evidence that no damages were suffered (*Bochantin v. Schroeder* (1973), 12 Ill. App. 3d 738, 299 N.E.2d 47 (abstract)), an award of damages which does not bear a reasonable relationship to the evidence is an indication of a compromise verdict. (*Keel v. Compton* (1970), 120 Ill. App. 2d 248, 256-57, 256 N.E.2d 848, 851-52.) Where the amount of damages is stipulated, or where the evidence of damages is undisputed, an award substantially less is an indication of a compromise verdict. (*Haizen v. Yellow Cab Co.* (1963), 41

Ill. App. 2d 330, 336, 190 N.E.2d 514, 517; *American National Bank & Trust Co. v. Reserve Insurance Co.* (1962), 38 Ill. App. 2d 315, 323-25, 187 N.E.2d 343, 348.) The jury's award of $0 to Kramer bore no reasonable relationship to the liquidated damages she suffered, the amount of which was not disputed. It indicated that the jury had compromised its verdicts on damages and liability, and could not stand.

■■ The trial judge realized that the jury's compromise verdict could not stand, but rather than grant a new trial he entered a judgment *n.o.v.* in favor of Kramer in the amount of the liquidated damages concerning which she had offered evidence. This was error. A judgment *n.o.v.* is not a proper procedural device for correcting a compromise verdict; instead, a new trial should have been ordered (*Hughes v. Bandy* (1949), 404 Ill. 2d 74, 80, 87 N.E.2d 855, 858), covering both the issues of damages and liability. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275, 286.) However, because Maryann Svetanoff is the only appellant, we have no authority to disturb any of the judgments except for the one in favor of Kramer and against Maryann Svetanoff from which the latter appealed. Since there is merit to Maryann Svetanoff's appeal, her claim against Kramer will be remanded for a new trial. Kramer's judgment against Michael Svetanoff in the amount of $1,069.37 as well as the judgment in her favor and against Colella will not be disturbed because neither Michael Svetanoff nor Colella has appealed from those judgments.

## III

■ Since there must be a new trial, it is necessary to review the instructions on liability given to the jury concerning the rights-of-way of the various drivers involved. Maryann Svetanoff urges that there was error in refusing to give two jury instructions. Both instructions referred to a municipal ordinance which the plaintiff argues applied to the case. She sought instructions which recited the ordinance and told the jury that a violation of it could be considered in the decision on negligence. The trial court refused to give the instructions; the refusal was not error, for the ordinance does not apply to the evidence in the case. The ordinance provides:

> "No operator of a vehicle shall enter an intersection or crosswalk unless there is sufficient space beyond such intersection or crosswalk in the direction which such vehicle is proceeding to accommodate the vehicle without obstructing the passage of other vehicular traffic or pedestrians, notwithstanding any traffic-control signal indication to proceed." (City of Chicago Municipal Code 1977, §27-224.)

Properly interpreted, the ordinance forbids any driver from entering an

intersection when traffic beyond the intersection is backed up into it. It addresses the situation where there is a solid line of traffic on the other side of an intersection, when any car that enters an intersection will be unable to clear it because there is no room for it on the other side. It is inapplicable to the present situation, where there was room *beyond* the intersection for both the Kramer and Svetanoff cars, but an obstruction *within* the intersection. A similar statute was adopted after the accident by the State of Illinois. It forbids entry into an intersection when there is no room "on the other side" of the intersection. (Ill. Rev. Stat. 1977, ch. 95½, par. 11—1425.) The statute is worded more clearly, but both the statute and the ordinance address the same situation.

■■ The jury was given both due care and right-of-way instructions to guide it in its determination of negligence. The latter consisted of recitals of the red light and green light statutes in effect at the time of the accident. We think that the instructions should have contained a more complete analysis. The relevant statutes, adopted from the Uniform Vehicle Code, provide:

(a) Circular green (alone).

1. Vehicular traffic facing the signal * * * may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited.

* * *

(c) Steady red indication.

1. Vehicular traffic facing a steady red signal must stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of an intersection, or if none, then before entering the intersection and shall remain standing until an indication to proceed is shown * * *. (Ill. Rev. Stat. 1973, ch. 95½, pars. 11—306(a), (c).)

The right-of-way issue here in its most stark form is whether Kramer was lawfully within the intersection when Michael Svetanoff entered it and struck her car. Did Kramer, who was facing a red light, have the right-of-way over Svetanoff, who was facing a green light? Elements of the question were addressed in *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 69 N.E.2d 293. In *Schneiderman* an eastbound bus entered an intersection on the green and collided with a southbound car which had entered the intersection on the preceding yellow light. The court held that the car was lawfully within the intersection at the time of the collision even though it was facing a red light, since it had been lawful to enter the intersection when it did so. Once a vehicle entered an intersection lawfully, it had the right-of-way to clear the intersection even

though the lights changed before it could do so. Accord, *Indianapolis & Southeastern Trailways, Inc. v. Cincinnati Street Ry. Co.* (1957), 166 Ohio St. 310, 318, 142 N.E.2d 515, 521; *Beard v. Ball* (1932), 96 Ind. App. 156, 160, 182 N.E. 102, 104.

*Schneiderman* held that the bus did not have an absolute command to go when it received the green light, but rather had a qualified permission to proceed carefully in the direction indicated. A vehicle with the green light had the duty of yielding the right-of-way to a vehicle which had not been able to clear the intersection before the lights changed. (Accord, *Lanegan v. Crawford* (1956), 49 Wash. 2d 562, 566, 304 P.2d 953, 955.) Because the driver of the bus received the green light when he was 25-30 feet from the intersection, the *Schneiderman* decision was not a difficult one. An open field on the corner permitted the bus driver to observe the progress of the southbound car as it approached and entered the intersection. *Schneiderman* thus differs from the instant case, where although Kramer entered the intersection lawfully, the driver of Svetanoff's car was not able to see Kramer's car until after he entered the intersection.

It might be argued that where the oncoming driver does not see the stopped car partially blocking the intersection, that driver should retain the right-of-way, on the theory that it is better to permit those cars that are moving to continue moving and to keep stopped those cars that are stopped. The stopped car is not in danger where it sits, but would become endangered if it tried to move through the intersection. This view would leave Michael and each car behind him with the right-of-way until Kramer's stopped car came to their attention through direct visual observation or some other method, such as honking of a horn. (See, *e.g.*, *Blue Ribbon Cleaners v. Aetna Casualty & Surety Co.* (La. App. 1961), 125 So. 2d 613.) We prefer a theory of rights-of-way which does not depend upon the honking of horns and which shortens, rather than prolongs, the amount of time that an intersection is blocked.

The better view was stated in *Allen v. State Farm Mutual Automobile Insurance Co.* (La. App. 1963), 151 So. 2d 122, *review denied* (1963), 244 La. 466, 152 So. 2d 562, a case on facts nearly identical to this. In *Allen*, the plaintiff's car entered an intersection headed west, then had to stop because its way was blocked by an oncoming car turning north. The light changed from green to red while Allen was stopped, and when the way was clear she moved forward to get out of the intersection. The defendant was southbound in the far lane and could not see Allen's car, since a line of southbound cars that were blocked by Allen obscured a complete view of the intersection. One southbound car passed behind Allen's vehicle, then the defendant collided with Allen. The court, in language which we approve, resolved the legal issue this way:

"We believe the key to the seeming conflict in the two rules involved, namely, the right of the motorist entering on a favorable signal to proceed despite a change in signal and the right of a party faced with a go signal to proceed without looking to right or left, is that the smooth and orderly flow of traffic requires that all vehicles lawfully within an intersection when a light change occurs must be afforded an opportunity to clear and must be permitted to pass through by all opposing vehicles whether stationary or in motion * * *.

* * *

While [the oncoming driver with the green light] could reasonably anticipate that no traffic would enter the intersection unlawfully or upon improper or unfavorable signal, she nevertheless is charged with seeing what was already within the intersection which she intended to enter. When [she] noticed the signal light change from red to green, she should have anticipated the opposing traffic lawfully in the six-lane intersection might not have cleared it." *Allen*, 151 So. 2d 122, 127-28.

There are several reasons which prompt us to adopt the reasoning and holding of the Louisiana case. It is apparently the only reported decision to address the precise issue in this case. It too arose under a version of the uniform act. It is consistent with the Illinois view already expressed in *Schneiderman.* Finally, there is a strong public interest in uniformity where motor vehicle rights-of-way are concerned. The point of law involved is sufficiently obscure that ordinary drivers are unlikely to anticipate that it will change with the passing geography. We have found the issue settled in one part of the country and prefer to settle it the same way here.

At the new trial, the jury even if it determines Kramer did not violate any rule of the road will still be required to decide whether she exercised ordinary care. Jury instructions given at the new trial are to be consistent with the views set forth in this opinion.

Judgment reversed and remanded for further proceedings consistent with the views set forth herein.

McNAMARA and McGILLICUDDY, JJ., concur.